## PROSECUTION FOR CRUELTY TO ANIMALS.

Common Pleas Court of Cuyahoga County.

EDWIN AMES AND F. H. AMES V. STATE OF OHIO.

Decided, March 27, 1911.

*Venue—Sufficiently Established, When—No Right to a Trial by Jury Where the Charge is for a First Offense Punishable by Fine Only— Notwithstanding a Second Offense May Be Punished by Imprisonment—Common Law and Constitutional Right to Trial by Jury— Section 13376.*

1. In a criminal trial before a magistrate in the city of Cleveland, the venue is sufficiently established if the evidence makes it appear that the offense was committed in Bedford township in the state of Ohio and within ten miles of the "public square," when it is a matter of common knowledge that the city of Cleveland is located in Cuyahoga county and there is a Bedford township in that county which is within ten miles of the public square in the city of Cleveland.

2. Where a statute makes a second and subsequent offenses punishable by imprisonment, this provision is not so intimately connected and allied with a previous provision making first offense punishable by fine only that the two can not be separated, and it is not error for a magistrate to refuse a trial by jury to one charged with a first offense.

3. To keep horses in an open field without water or care in the month of December, in the latitude of Cleveland when the temperature is as low as 16 degrees Fahrenheit, constitutes cruelty to animals within the meaning of the Ohio statute.

*Benj. J. Sawyer,* for plaintiff in error.
*T. H. Bushnell,* contra.

FORAN, J.

Error to the court of John J. McEwen, justice of the peace in and for the township of Rockport.

The plaintiffs in error were arrested on affidavits of date December 8, 1910, which charge that they and each of them did then and there unlawfully torture certain animals, named in the affidavits, by not providing them with good, wholesome food and sufficient water, and in failing to provide proper shelter for

said animals, thereby causing them unnecessary pain and suffer-
ing, contrary to the form of the statute in such cases made and
provided.

The affidavit was drawn under an act of the General Assembly
of the state of Ohio approved April 23, 1910, which act was
amendatory of Section 13376 of the General Code of Ohio, relat-
ing to the defining and punishing of offenses pertaining to the
prevention of cruelty to animals.

The amendment to Section 13376 of April 23, 1910, provided
that for each subsequent offense the offending person shall be
fined not less than ten dollars nor more than two hundred dollars,
or imprisoned not more than sixty days or both.    In other words,
the amendment of this section provided imprisonment as a pen-
alty for a second and each subsequent offense under the statute.

The defendants were convicted by the justice, and each sen-
tenced to pay a fine of twenty-five dollars and costs, or stand
committed to the county jail of Cuyahoga county until such fine
and costs were paid; to which sentence of the court the defendants
excepted, and now prosecute error to this court, urging, among
other things, that the court erred in refusing the defendants a
trial by jury, that there was no venue proven during the trial,
and that the court erred in going personally to view the premises,
thereby taking upon himself the duties of a witness, after both
sides had rested and the testimony had been all submitted.

On page 87 of the record, the court is quoted as having said:
"There has been so much contradictory testimony here, and so
much contention, I am going out to look at that farm myself."
And it is claimed that before announcing its decision the court
did view the premises in question.

So far as this assignment of error is concerned, it is sufficient
to say that there was no exception taken at the time by counsel
for the plaintiffs in error; and, so far as the record appears, the
plaintiffs in error and their counsel agreed that the court might
view the premises.    In any event, we think it would be per-
fectly proper for the court to view the premises, the same as a
jury might have done, upon application of either of the parties
and upon order of the court; and we believe it wholly immaterial
whether this was done before or after the testimony was in-
troduced.

So far as the question of venue is concerned, it is sufficient to say that counsel for the plaintiffs in error has evidently forgotten the testimony taken at the trial, and overlooked the fact that the record (page 35) clearly shows that the venue was, in fact, proven, as laid in the affidavit. Besides, if it was not proven in express terms, it can be inferred from the facts and circumstances otherwise appearing in the record. An assignment for error, purely technical, based upon an exception or an alleged error, which in no way affects the substantial rights of parties, or the merits of the controversy, should not be given serious consideration by a reviewing court. Section 13636, General Code, provides that "all criminal cases shall be tried in the county where the offense was committed," unless a change of venue is granted upon application of the defendant. It ought to be presumed, as a matter of law, by a reviewing court that the trial court would not assume jurisdiction of a criminal case unless it had a clear right to do so, as the statute is mandatory in its terms. In practically all criminal actions in the United States the venue must be in the county where the act was committed. It is quite evident that counsel who appear for defendants in criminal causes know and have the means of knowing where the alleged criminal act was committed, and if, without objection, they permit a court to assume or take jurisdiction when in fact jurisdiction does not exist, they ought not to be heard upon the question of venue in a reviewing court. That the trend of opinion of courts of last resort is in this direction is quite apparent.

"In the prosecution of a criminal case, it is not essential that the venue of the crime be proven in express terms, provided it be established by all the facts and circumstances of the case beyond a reasonable doubt that the crime was committed in the county and state as alleged in the indictment" (*State* v. *Dickerson*, 77 O. S., 34). See also *Tinney* v. *State*, 111 Ala., 74, where it was held: "That in a criminal case it was not necessary to prove in express terms that the offense was committed in the county where the indictment was found; evidence from which the jury could so infer is sufficient."

In the record before us there are abundant facts and circumstances establishing the venue, even if it was not proven in express terms.

It is strenuously claimed that the verdict in the case at bar is not sustained by the evidence.    A cursory examination of the record shows that the defendants below kept the animals mentioned in the affidavit in a large open field, in which there was a sort of barn or shed, the north side of which was completely open to the wind and the rain and the snow, and the east end of which was partially open.

On the 8th day of December, 1910, photographs of this shed were taken, and copies of these photographs are attached to the bill of exceptions, and made part of the record.    It is admitted by the defendants that from December 8th, 1910, to December 16th, 1910, the time covered by the testimony, the temperature at the place where the animals were located or kept, ranged from 22 degrees down to 16 degrees Fahrenheit, the lowest temperature being 16 degrees below the freezing point.    That the shed afforded practically no shelter is abundantly shown by the photographs and the evidence.    To keep horses without covering of any kind, as the record shows these horses were kept, in a shed that afforded practically no shelter, and through which the piercing winds, the sleet and the snow might freely blow and sweep when the temperature was as low as 16, or even 20 degrees Fahrenheit, is cruelty to animals, within the meaning of the statute, and unquestionably caused these animals unnecessary pain and suffering.

There was no water upon the place accessible to the animals there kept and located, except that which might be found beneath the ice of a swampy or marshy pasture, and in this ice, which was two or three inches thick, no holes had been cut, the contention of the plaintiff in error being that the natural instinct of the animals would cause or impel them to break or paw holes in the ice, and then wait for the water to rise from the muddy bottom of the swale to the surface, so that they might assuage their thirst, which it seems was augmented considerably by a plentiful supply of salt, kept in the shed in an open receptacle of some kind.    It is undoubtedly true that animals in a wild state will find water by breaking through comparatively thin ice, or by pawing holes in swamps or swales, so that the water may seep to the surface, but it is exceedingly doubtful if domesticated

animals would do this under the conditions prevailing at the time and place disclosed by the evidence in this record. Counsel for plaintiffs in error, however, naively suggest that the animals did not suffer from thirst for the reason that there was an abundance of snow upon the ground, which they might have eaten. As this suggestion was evidently made tentatively rather than seriously, it will not be further noticed.

The law in this country, so far as cruelty to animals is concerned, seems to be well settled that any "neglect which would naturally cause suffering, is punishable, though no great suffering has in fact resulted therefrom" (Am. & Eng. Enc. of Law, Vol. 8, p. 447). "The offense or failure by him who has charge or custody of an animal, to provide it with proper food, drink, shelter, and protection from the weather," has been held to be cruelty under the Massachusetts statute. *Commonwealth* v. *Curry*, 150 Mass., 509.

The facts in the Massachusetts case seems to be that a horse harnessed to a carriage was left in the woods for more than twenty-four hours, uncared for, without food and drink, except what food the horse obtained by browsing in the woods, and the court said this was cruelty, even though it did not appear, when the horse was found, that it had actually suffered from exposure or hunger, and that when given water, it had drank but half a pail, and was then driven home, a distance of twelve miles, without other food than the grass found by the roadside.

It is true that the horses and the heifer, mentioned in the affidavit, had plenty of musty hay, which was exposed to the weather in stacks, upon which they might feed at will, provided they had a will to do so, and besides, as counsel for defendants below vainly sought to show, they might forage upon withered corn stalks for an occasional nubbin of corn, overlooked by the thrifty farmers when the corn was garnered, but the presence of these nubbins, however, the agent of the Humane Society claimed existed only in the vivid imagination of counsel; but then the animals could roam at will over this vast frozen expanse of pasture, meadow and tilled land, and dig out and root for water over many acres of snow and ice covered marshy pasture. Indeed, the case may be said to be one of "dig horse or die."

We fully believe, and therefore hold, that to keep horses in an open field in the month of December, in this latitude, when the temperature is as low as 16 degrees Fahrenheit, no effort being made to furnish them with water, or to provide a suitable or proper place where the animals might obtain water themselves, is cruelty to animals within the meaning of the statute, and it is clear from the evidence that the animals were caused unnecessary pain and suffering by reason of the failure of the defendants below to provide them with water. We are not surprised that the agent for the Humane Society, when he visited this place on the 8th of December, found the animals in a logy, inert condition, and found that their hair was "stareing" and that it stuck out from their bodies "like quills upon the fretful porcupine."

But, aside from all this, a reviewing court does not feel at liberty, because there may be a mere difference of opinion between it and the trial court, in disturbing the verdict of the latter. The justice heard the witnesses in this case; he had that opportunity which the reviewing court has not of noticing their manner of testifying, their frankness and candor, or apparent lack of frankness and candor; and the justice, as it appears by the record, voluntarily, but without opposition, proceeded to the place where these animals had been kept, and viewed for himself the premises, and thus acquainted himself thoroughly with the situation; for these reasons we would not feel like disturbing the judgment rendered, no matter what our personal opinion might be in respect to the value and weight of the testimony.

In the case of *Thomas McGatrick* v. *Charles Wason,* decided by Judge Thurman, 4 O. S., 566, the court says (page 576):

"A mere difference of opinion between the court and jury does not warrant the former in setting aside the finding of the latter. That would be, in effect, to abolish the institution of juries, and substitute the court to try all questions of fact."

In the case at bar, the justice before whom this case was heard must for all practical purposes be considered as the jury trying the case, and before the judgment of the justice will be disturbed, because in the opinion of counsel it may be against the

weight of the evidence, it must be manifestly clear that the justice court erred in this respect, before a new trial will be granted on that ground. Reviewing courts will not disturb the finding of a jury unless it clearly appears—manifestly so—that the verdict is the result of bias, passion or prejudice, or a misconception of the facts. It clearly appears to us that the finding and verdict of the justice was abundantly justified by the evidence, and therefore this assignment of error is overruled.

There only remains the question as to whether the defendants below were entitled to a jury. Section 13376 of the General Code, as it stood before the amendment of April 23, 1910, did not provide for imprisonment as a part of the penalty for violation of the provisions thereof. As has been said above, the amendment consisted simply in providing that for a second or any subsequent offense, imprisonment might be a part of the penalty. The contention of counsel, as we understand it, is this: That if the defendants below were called upon to defend any subsequent case or for another violation of the same statute, they would be injured by reason of the fact that a jury did not pass upon the question as to whether they were guilty of the first offense. In other words, that the provision of the statute making a second and subsequent offense punishable by imprisonment, is so intimately connected and allied with the first portion of the statute that the two can not be separated. We do not so understand it. If this case were tried to a jury upon an information, the jury could not find the defendants guilty of having violated the statute a second time, unless the information specifically set forth in exact terms that the offense for which the defendants were being tried was a second violation of the statute. Nor could the justice, upon the affidavit filed before him, impose, as a part of the penalty, imprisonment; and for the reason that the affidavit does not explicitly specify that the offense was a second or a subsequent one, or that the defendants had been previously convicted under the statute. Because the state, in this prosecution, did not see fit to charge the defendants below with violating this statute a second time, complaint is made. We believe that the defendants ought to be grateful that the affidavit did not contain such a charge or such an allegation.

The contention here, however, raises the old question as to the right of trial by jury in this class of cases. The statute for the prevention of cruelty to animals, as well as that providing for the prevention of cruelty to children, is clearly an exercise of police power of the state. As we understand that power, it may be defined as being a power that is inherent in the state, and which enables the state to prohibit all things hurtful to the comfort and welfare of society, even though the prohibition invade the right of liberty or property of the individual. It has also been defined as the authority to establish, for the social intercourse of the members of the body politic with each other, those rules of good conduct and good neighborhood which are calculated to prevent a conflict of rights and to insure to each the uninterrupted enjoyment of his own so far as reasonably consistent with the corresponding enjoyment by others. This doctrine is so well understood now that citation of authorities in support of it is wholly unnecessary.

The constitutional provision with respect to the right of trial by jury in the Constitution of 1851 will be found in Sections 5 and 10 of the Bill of Rights. Section 5 provides, "that the right of trial by jury shall be inviolate"; and Section 10 provides that "In any trial in any court, the party accused shall be allowed to appear and defend in person and with counsel, to demand the nature and cause of the accusation against him, and to have a speedy public trial by an impartial jury of the county or district in which the offense is alleged to have been committed."

It is now well settled in this state that these constitutional provisions were not intended to enlarge or modify the right of trial by jury. Their sole purpose was to guarantee the perpetuity of the jury trial or the institution of trial by jury as it existed under the Constitution of 1802. *Work* v. *State*, 2 O. S., 297.

By a strange coincidence it seems that the fifth paragraph of the Bill of Rights of the Constitution of the state of Kansas is in the identical language of the fifth paragraph of the Bill of Rights of the Constitution of this state. Passing upon this constitutional provision the Supreme Court of Kansas (*State, ex rel*, v. *City of Topeka*, 36 Kan., 86) says:

"This means that the right of trial by jury shall be and remain as ample and complete as it was at the time when the Constitution was adopted."

This is the law in Ohio today, as we understand it. That is, the meaning of the two paragraphs, Sections 5 and 10 of our Bill of Rights, is that a jury trial is preserved in all cases in which it existed prior to the adoption of the Constitution of 1851. The right is preserved, not extended. It remains inviolate, that is, it is not disturbed or limited, and as the Kansas court said, it is as ample and as complete as when the Constitution was adopted, but no more so.

At common law summary proceedings for the trial of certain causes always exist, that is, when public policy and the general welfare demands it, a summary proceeding is had, largely for the reason that it is desirable to obtain a determination of the question involved without delay; for instance, the assessing and collection of taxes has always been necessarily summary in order that it may be speedy and effectual. 95 U. S., 41.

These summary proceedings have always been heard, prior to the adoption by our state Constitution, and since their adoption, for hearing and determining charges of the lower misdemeanors by committing magistrates without the intervention of a jury; they are in the nature of punishments for contempt of court. Before the American Revolution by the common law of England, and the laws of many of the colonies, summary proceedings existed for the recovery of certain debts due the government, and for other purposes. And it is now well understood in all the states in the American Union that the Legislature may withhold trial by jury from new offenses created by the statute and unknown to the common law—as in case of the Sunday law, and numerous enactments in the nature of police regulations for preserving the public peace.

In this class of cases it is no invasion of the rights of the citizen to provide some other mode of determining contested facts, because at common law which antedated our constitutions, trial by jury did not exist in such cases. *Rhines* v. *Clark*, 51 Pa., 101; *Lacroix* v. *Commissioners*, 50 Conn., 327, and cases there cited.

394 CUYAHOGA COUNTY COMMON PLEAS.

In the case of *Inwood* v. *State,* 42 O. S., 186, it was held that a statute which authorized a penalty by fine only upon a summary conviction under a police regulation, or of an immoral practice prohibited by law, although imprisonment as a means of enforcing the payment of a fine is authorized, is not in conflict with either Section 5 or Section 10 of Article I of the Constitution, on the ground that no provision is made for a trial by a jury in such cases.

It clearly appears from the *dicta* in this case, as well as numerous other cases decided by our courts, that those statutes which define and punish by fine certain immoral practices and offenses which are *mala prohibita,* in a summary manner without trial by jury, are not in conflict with the Constitution of the state. There are any number of such offenses defined by our statutes, and many of them have remained unchallenged since the organization of the state government. The question under consideration in the case of *Inwood* v. *State* was a violation of an act which punished any person or persons who shall at any time interrupt or molest any religious society or any religious or other meeting. The statute relating to religious or other meetings, being Section 12814 of the General Code, provides imprisonment as a part of the penalty; and yet it was held, in the Inwood case, that a party offending against that statute is not entitled to a trial by jury because it is a summary proceeding, based upon the fact that the offense consists in an immoral practice or a thing which is *malum in se,* that is, bad in itself, as well as *mala prohibita.*

In the case of *Markle* v. *Akron,* 14 O. S., 587, our Supreme Court held an ordinance which prohibited, under a money penalty, persons not licensed in taverns and bars from selling intoxicating liquors within the corporate limits of the town, to be constitutional, notwithstanding the mayor, without the intervention of a jury, was authorized to try the case and impose the penalty.

This case, that is, *Markle* v. *Akron,* was determined by our Supreme Court, at the January term, 1846, when the Constitution of 1802 was still in force in this state, and it clearly appears from the facts in this case that the doctrine now contended for

was well known and understood before the adoption of the Constitution of 1851, which contains the previous Sections 5 and 10 of the Bill of Rights above cited.

These cases clearly show that at common law the right to demand a trial by jury in this class of cases did not exist; and also that the common law rule was not changed by the constitutional provisions under consideration. The doctrine of the common law, that fines in such offenses of a minor character might be imposed and collected without the intervention of a jury, and by magistrates who had no jurisdiction in the trial of jury cases, is abundantly established by a long line of cases in this state and by text-writers of undoubted learning and ability.

These cases may be defined ·to be mere police regulations, and they are only *quasi*-criminal in their nature. The statutes for the punishment of immoral and pernicious practices by pecuniary penalties, but under which, by the common law, as above shown, the accused was never entitled to demand a trial by jury, are now universally admitted in this state to ·be constitutional and valid.

In *Thomas* v. *Ashland,* 12 O. S., 124, it was held that an ordinance of a village which imposed imprisonment as a penalty for an offense, where no provision was made for a trial by jury, was in conflict with Section 10 of the 1st article of the Constitution; but in that case the court was careful to exclude from the operation of the rule there laid down cases where the punishment was by fine only, although imprisonment was authorized as a means of enforcing the payment of the fine.

In the case of *Fletcher* v. *State,* 13 O. C. C., 674, it was held that Sections 5 and 10 of Article I of the Constitution did not apply to prosecutions under ordinances which authorized a penalty by fine upon a summary conviction under police regulation, or under an ordinance for an immoral practice prohibited by law. The case there under consideration was the crime of suffering a gaming device to be used, to-wit, a slot machine; and it was held by the court that the ordinances which provided for .a summary conviction of persons accused of violating its provisions were clearly constitutional. Each of the Sections 5 and 10 of Article I of the Constitution has been the subject of re-

peated adjudications by our Supreme Court; but in view of the decision in the Inwood case, *supra*, it is not necessary to refer to them in detail or at length.

In the case of *Craig* v. *State*, 49 O. S., 418, the court say:

"It is insisted that the framers of the Constitution of 1851 intended to make the punishment for crime, at least in the higher courts, an act of society to be accomplished only through the intervention of a jury, the special representatives of society. This doctrine would exclude a plea of guilty, and force upon the accused, as well as the state, a trial by jury to establish facts about which there was no dispute."

Before the doctrine laid down in the case of *Inwood* v. *State*, 42 O. S., 186, was well understood, juries were demanded and generally accorded in the police courts of the larger cities of the state where persons were arrested for violating Sunday laws, and statutes of a similar nature. The court has now in mind an instance, occurring many years ago, where a union of salesmen sought to enforce the Sunday closing law by arresting all persons, not within the exception, who performed common labor on Sunday, and all persons who unlawfully kept places of business open for the purpose of transacting business. Some twenty or thirty of these cases were brought into the police court of this city, and in each of these cases a jury was demanded and the demand granted by the court. The result was an absolute failure to enforce the law. The police court was crowded with other business, and could not give its time or attention to the trial of twenty or thirty jury cases in which a large number of witnesses had been subpoenaed, and each of which cases would occupy perhaps two or three days time. The result was that the effort on the part of the union to have one day of rest in seven proved abortive.

It is for this as well as other reasons that the courts of this state have uniformly held that in any case involving violation of statute or ordinance, where fine only is a part of the penalty, a jury is not an inalienable right of the accused, and may refused. To say that violations of the Sunday law, such as those above mentioned, and other offenses of a similar nature and character, may be openly and persistently committed because the defendant in each case could demand a jury and thus

prevent the administration of justice, would be going to extreme limits. To concede such a contention would be practically to close the courts. If a man were entitled to a trial by jury for every violation of an ordinance, or for a statute prohibiting any pernicious habits or practices which are *mala prohibita,* the number of courts that would be required to hear and determine these cases would startle the citizen, and the expense to the state for the enforcement of the peace and public order would be practically so great that the enforcement of law, and the preservation of the public peace would be impossible.

We find no error in this record, or in any of the assignments of error, and the judgment of the court will be, that the judgment of the justice court will be affirmed, and a mandate will issue.